UNITED STATES

v.

ACME STEEL COMPANY.

A.R.D. 152.

Reappraisement No. R60/11501.

United States Customs Court
Second Division, Appellate Term.
March 26, 1963.

John W. Douglas, Acting Asst. Atty. Gen. (Samuel D. Spector, New York City, trial attorney), for appellant.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel) for appellee.

Before LAWRENCE, RAO, and FORD, Judges.

RAO, Judge.

This is an application for review of a decision and judgment of a single judge sitting in reappraisement (Reap.Dec. 10135) sustaining the entered values of an importation of steel strapping from Canada.

The merchandise in issue was exported on or about March 14, 1960, by the Acme Steel Company of Canada, Ltd., Toronto, Ontario, and imported by the Acme Steel Company of Chicago, Ill., through the port of Buffalo, N. Y. It consisted of three sizes of steel strapping entered, as invoiced, in Canadian funds, f. o b., Toronto, at, respectively, $13.46, $12.82, $12.72 per 100 pounds. It was appraised at the entered unit values, plus 27.40 per centum Canadian dollars, packed, concededly upon the basis of constructed value, as that value is defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

It was the position of appellee before the trial court, as it is here, that the proper basis of value for the importation in issue is export value, as defined in section 402(b) of the Tariff Act of 1930, as so amended, and that such values were the entered values. Alternatively, appellee agreed that constructed value was a proper basis for determining the values of the subject importation, but contended that such value was likewise represented by the entered values. The trial court sustained appellee's primary claim.

The statutory definitions of the values in contention read as follows:

"[SEC. 402] (b) Export value. For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States."

"[SEC. 402] (d) Constructed value. For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

"(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

"(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by pro-

ducers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

"(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States."

At the trial, the parties stipulated that the merchandise here involved does not appear on the final list, published by the Secretary of the Treasury pursuant to section 6(a) of said Customs Simplification Act of 1956; that the basis of the appraised value was, in fact, constructed value; that the only item of such value in dispute was that of general expenses, as defined in said section 402(d) (2); that the appraised value at the entered unit values, plus 27.40 per centum, represents part of the difference between the home market price and the export price to the United States; and that there was no other Canadian exporter of merchandise of the same general class or kind during the period covered by the instant importation. However, it does appear that similar merchandise was produced by one other Canadian firm which sold only to customers in Canada.

The record further established that the Canadian exporter was the wholly owned subsidiary of the American importer and that all its sales for exportation to the United States during the period between the first week of May 1959 through the middle of 1960 were made to the parent corporation. Such sales were characterized by appellee's office-manager accountant as outright sales which were made at a price calculated by deducting 30 per centum from the Canadian domestic prices to allow for certain expenses not incurred in connection with shipments to the United States.

According to this witness, sales in Canada for domestic consumption were made directly to users, and the expenses involved in consummating them included selling, distribution, advertising, travel and entertainment, warehousing, freight, and the repair and maintenance of tools supplied to these customers, without charge, in connection with the use of the steel strapping. By contrast, sales for exportation to the United States did not require any of said expenses. Sales were f. o. b., Toronto, the purchaser was a distributor whose merchandise was not warehoused by the exporter, and tool service charges and sales promotion expenses were not incurred in selling to the parent corporation.

As office manager and accountant, the witness' duties required that he be responsible for, and have complete knowledge of, all costs entering into the production of the merchandise at bar. He considered the deduction of 30 per centum from the Canadian carload lot prices as representing the saving in cost effected by the elimination of the stated selling expenses. Other costs per 100 pounds for producing such merchandise were given as follows:

| | Sizes in inches | | |
| --- | --- | --- | --- |
| | ⅜ by .015 | ⅝ by .020 | ¾ by .020 |
| Material ..................... | 7.58 | 7.16 | 7.19 |
| Labor ..................... | .31 | .17 | .19 |
| General Expenses | | | |
| Administrative cost of accounting, traffic, and engineering ........ | .30 | .30 | .30 |
| Paint, lead, and wax ............. | .21 | .21 | .21 |
| Fixed factory overhead .......... | .70 | .70 | .70 |
| Coverings, containers, packing ...... | .29 | .29 | .29 |
| Profit ......................... | 4.07 | 3.99 | 3.84 |
| (Canadian) | 13.46 | 12.82 | 12.72 |

These were the figures at which the respective sizes were invoiced and entered. The witness further stated that such figures coincided with its export pricelist, dated May 5, 1959, which was received in evidence as plaintiff's exhibit 1; that they fairly reflected the market value for shipment to the United States and represented the prices his company would have been willing to charge any other distributor in the United States.

A list of all the company's sales for exportation to the United States during the first 3 months of 1960 was also received in evidence (plaintiff's exhibit 4).

Aside from the stipulated fact that the appraiser's addition of 27.40 per centum to the entered unit values represents part of the difference between the home market price and the export price to the United States, the record does not reveal which, if any, of the expenses incurred in the home market transactions were considered inapplicable and, hence, not included in the appraised value of the merchandise. The trial judge concluded that the partial allowance was attributable to the expense items of freight and tool repair service, which items were clearly not involved in sales for exportation to the United States. In view of the record in this case, this would seem to be a reasonable and proper inference.

Under the provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, the primary basis for the determination of the value of imported merchandise is export value, and if such value can be satisfactorily determined, no other basis of value may properly be considered. It is also true, however, by virtue of the provisions of 28 United States Code, section 2633, which have been left undisturbed by the new act, that the value found by the appraiser is presumptively correct, and the burden rests with the party challenging it to prove otherwise.

In this instance, the appraiser has found constructed value to be the proper basis for determining the value of the merchandise at bar; and implicit in that finding, in view of said section 402, as amended, is a finding that no other basis can be satisfactorily determined.

Accordingly, and since the parties have also stipulated that the only item in dispute in the appraiser's finding of constructed value is the item of general expenses, as defined in section 402(d)(2), supra, the issues here are confined to the questions of whether appellee established an export value within the contemplation of section 402(b), supra, or, alternatively, whether or not the general expenses were as reflected in the appraiser's return.

Consideration of the scope of the new statutory definitions of value, and of the essential elements of proof thereof, is facilitated by the statute's self-contained definition of terms. Insofar as here applicable, these definitions, which are provided for in subdivision (f) of said section 402, read as follows:

"(f) Definitions. For the purposes of this section—

"(1) The term 'freely sold or, in the absence of sales, offered for sale' means sold or, in the absence of sales, offered—

"(A) to all purchasers at wholesale, or

"(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, without restrictions as to the disposition or use of the merchandise by the purchaser, except * * *.

"(2) The term 'ordinary course of trade' means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

"(3) The term 'purchasers at wholesale' means purchasers who

buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or * * *."

It is at once apparent from the foregoing that, in the interpretation of the phrase "freely sold or * * * offered for sale," an entirely different approach from that heretofore obtaining under prior statutes is authorized, and sales to one or more selected purchasers at wholesale may be considered in the determination of value, if such sales have been made in the ordinary course of trade "at a price which fairly reflects the market value of the merchandise" and without restrictions as to disposition or use.

Consequently, the fact that the importer herein was the sole purchaser of merchandise exported to the United States does not *per se* affect the question of whether or not there was an export value for the instant merchandise, and, as the trial court quite properly observed, it does not appear that sales to it were accompanied by any restrictions as to use or disposition of the merchandise. Moreover, it seems clear that the elements of usual wholesale quantities and principal markets are not here in contention, the former for the reason that prices did not vary by reason of quantity sold (Jenkins Brothers v. United States, 25 CCPA 90, T.D. 49093), the latter because it affirmatively appears that all sales for exportation to the United States were f. o. b., Toronto, the exporter's place of business.

The question of whether or not there was an export value for merchandise such as or similar to that here undergoing appraisement depends, therefore, upon the existence of sales in the ordinary course of trade at prices which fairly reflect the market value of the merchandise.

The trial court adopted the view that, inasmuch as one of the principal objects of the Customs Simplification Act of 1956 was the elimination of foreign value, as defined in section 402(c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, to wit, the value of merchandise offered for sale for home consumption in the principal markets of the country of exportation, it was improper to consider domestic sales in Canada as having any bearing upon the phrase "trade under consideration" in the definition of "ordinary course of trade"; and that the only relevant sales were those for exportation to the United States. Its opinion states:

"It would be strange if foreign value were eliminated as a basis for customs valuation and yet the incidents of foreign value, such as the ordinary course of trade of selling merchandise for home consumption, would be allowed to control or affect export value. Such a view, it seems to me, would negate the intention to eliminate foreign value as a method of valuation, and would certainly not *simplify* customs administration; it would complicate it. I, therefore, find that evidence as to conditions or practices obtaining in the trade of selling merchandise of the class or kind involved for home consumption in Canada is not probative of any fact necessary to a determination of whether such merchandise was or was not sold 'in the ordinary course of trade' within the meaning of that term, as used and defined in the statute." [Italics quoted.]

Notwithstanding the clear statement of purpose on the part of the Senate (Senate Report No. 2560, 84th Congress, 2d session, to accompany H.R. 6040, the Customs Simplification Act of 1956, U.S.Code Cong. and Adm.News, 1956, p. 4179) to eliminate foreign value as a basis of valuation, and to constitute export value alone as the primary basis, it does not seem to us that normal conditions and practices in the trade under consideration, within the purview of the definition of the term "ordinary course of trade," require that any usual transactions be disregarded. We do not read the phrase "ordinary course of trade" as limited to sales for exportation to the

United States, but rather construe it as embracing the usual practices surrounding all sales of such or similar merchandise. Seemingly, the object of considering sales in the ordinary course of trade was to prevent occasional or fugitive or transitory sales from exercising any effect upon the value of imported merchandise. But where sales are made in the regular course of business, it is appropriate to consider such transactions to ascertain the price which fairly reflects the market value of the merchandise.

■ In our view, the pertinent and proper inquiry here is what were the customary practices in Canada with regard to the sale of steel strapping of the class or kind here involved. In this connection, the record plainly shows that, for a reasonable time prior to the instant importation, it was the usual and normal procedure for the manufacturer and seller of identical merchandise to offer its goods for sale both for domestic consumption to industrial users, and for exportation to the United States, to one selected purchaser for distribution and resale, the former at a price in carload lots which included expenses of sale, the latter at a price which excluded such expenses. It further appears that similar merchandise manufactured by another Canadian firm, the Canadian Steel Strapping Company, was sold only for home consumption.

Although the record with respect to the sale of similar merchandise does not set forth the specific practices engaged in by the Canadian Steel Strapping Company, there is some evidence to establish that comparable sizes are offered to customers for similar strapping applications in the same manner as employed by Acme Steel Company of Canada, Ltd. Moreover, counsel for appellant apparently concedes that, for the purposes of this case, the sales practices of the exporter represent usual trade conditions. In this connection, appellant's brief states (p. 7):

"* * * There is evidence in the record that the Canadian Steel Strapping Company sold products of the same general class or kind as the involved merchandise (R. 23). The record is silent as to the normal practices of that company in the conduct of their business. Such proof is essential to establish the ordinary course of trade as that term is defined in section 402(f) (2), supra. *Apparently, and it is presumed to be so in the absence of any proof to the contrary, the conduct of the importer in its home market business was the normal manner in which persons engaged in the same general class or kind of business transacted their affairs.* It was proper for the Appraiser to adopt that view in considering whether or not the transactions in question satisfied the statutory requirements for a finding of export value." [Italics supplied.]

■ In the view that we have here taken that all sales in the ordinary course of trade must be considered in ascertaining the price which fairly reflects the market value of the merchandise, it follows that evidence of the price and, hence, of the value of goods in the foreign market is relevant to the ultimate determination of the export value of imported merchandise within the purview of section 402(b) of the Tariff Act of 1930, as amended, supra, in the case of sales to selected purchasers. That is not to say, of course, that the price at which such merchandise is freely sold in the foreign market must necessarily be the same as the price at which it was offered for exportation to the United States, for export value to exist. It is merely that, in considering the price for exportation, the elements entering into the domestic price which are the same as those entering into the export price have a direct bearing upon whether or not the export price fairly reflects the market value of the merchandise.

■ Indeed, we are of opinion that this is but one of only two areas of competent evidence in the instant record from which a price fairly reflective of

market value can be determined. We reject as lacking in probative value both the exporter's pricelist and the witness' statement that the prices therein quoted were the prices at which the company was willing to sell the individual sizes to any other distributor in the United States. There is no evidence in the record to show that the pricelist in question was ever circulated to any potential customers. A pricelist which is maintained for private use and is not brought to the attention of any prospective buyers is a self-serving document which lacks probative force as evidence. United States v. North American Asbestos Corp., 44 Cust. Ct. 801, A.R.D. 123, affirmed, Same v. Same, 48 CCPA 153, C.A.D. 783.

 We are in agreement with the trial court that, in the phrase "which fairly reflects the market value of the merchandise," the key expression is market value, and that the following quotation from the case of United States v. Alfred Kohlberg, Inc., 2 Cust.Ct. 849, Reap.Dec. 4526, affirmed, Same v. Same, 27 CCPA 223, C.A.D. 88, is an acceptable definition thereof:

> "Market value has been defined as the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, and the purchasers are willing to pay, in the ordinary course of trade. See United States v. Sixteen Cases of Silk Ribbons, 27 Fed.Cas.No.16,301, p. 1099 * * *."

Nevertheless, we adhere to the view that unsupported expressions of willingness to sell do not constitute proof of market value. Transatlantic Shipping Co., Inc. (Absorbo Beer Pad Co., Inc.) v. United States, 28 CCPA 19, C.A.D. 118.

The record in the instant case does, however, establish that included in the price at which such merchandise is sold for home consumption in Canada were certain selling expenses which were not incurred in export transactions; that the export price differs from the domestic price only to the extent of the value of said expenses; and that the 30 per centum deduction fairly represents the savings in cost effected by the elimination of the several items comprising selling expenses.

It also establishes that the invoice prices were equal to the sum of the production costs, general expenses entering into export transactions and profit, and that such prices fairly reflected the market value for exportation to the United States.

This we consider to be substantial evidence of a price which embodies all of the material elements entering into the new statutory definition of export value in the case of sales to one or more selected purchasers. Accordingly, we conclude, as did the court below, that appellee has sustained its burden of establishing that there was an export value for the instant merchandise and that such value was represented by the invoice and entered values.

The court, therefore, finds that—

1. The merchandise involved in the instant case consists of steel strapping, exported from Canada on or about March 14, 1960.

2. Said merchandise does not appear on the final list promulgated by the Secretary of the Treasury, pursuant to section 6(a) of the Customs Simplification Act of 1956.

3. Said merchandise was appraised on the basis of constructed value, as that value is defined in section 402(d) of the Tariff Act of 1930, as amended by said Customs Simplification Act of 1956, at the entered unit values, plus 27.40 per centum.

4. Said merchandise was entered at the invoiced unit values, which are claimed to represent export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by said Customs Simplification Act, or, alternatively, constructed value, predicated upon amounts for general expenses other than those entering into the appraised values.

5. During all times pertinent hereto, said merchandise was produced and exported by Acme Steel Company of Canada, Ltd., Toronto, Ontario, and there was no other Canadian exporter of merchandise of the same class or kind.

6. In the ordinary course of trade, said Acme Steel Company of Canada, Ltd., Toronto, Ontario, sold such merchandise both for home consumption in Canada and for exportation to the United States.

7. Said Acme Steel Company of Canada, Ltd., Toronto, Ontario, customarily sold such merchandise for home consumption, in carload lots, to industrial users, at prices which included certain selling expenses, to wit, selling, distribution, advertising, travel and entertainment, warehousing, freight, and tool repair services.

8. The fair value of said selling expenses represented 30 per centum of the price of sales for domestic consumption.

9. At all times pertinent hereto, said Acme Steel Company of Canada, Ltd., Toronto, Ontario, customarily sold said merchandise for exportation to the United States only to the Acme Steel Company of Chicago, Ill., a purchaser at wholesale, without restrictions as to the disposition or use of the merchandise by the purchaser.

10. Said Acme Steel Company of Chicago was a distributor, and no selling expenses were incurred by the exporter in sales to it.

11. Prices for exportation to the United States did not vary by reason of quantities sold.

12. The invoiced and entered values were equal to the home market prices, less selling expenses, as well as to the sum of the costs of production, general expenses exclusive of selling expenses, and profit.

The court, therefore, concludes that—

1. Sales for home consumption and production costs are competent proof of prices which fairly reflect market value.

2. The invoiced and entered prices fairly reflect the market value of the merchandise for any quantity when sold for exportation to the United States.

3. At the time of exportation to the United States, the invoiced and entered prices were the prices at which such merchandise was freely sold in the principal markets of Canada, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

4. Export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise covered by the instant appeal for reappraisement and that such values are the entered values.

5. The judgment of the trial court be, and the same hereby is, affirmed.

LAWRENCE, Judge (concurring in the result).

While I concur in judgment reached by my associates, I find myself in disagreement with that portion of their opinion in which they hold a contrary view to the conclusion of the trial court with regard to the phrase "trade under consideration" in the definition of "ordinary course of trade."

I quote, with approval, the statement of the learned trial judge to which the majority take exception:

"It would be strange if foreign value were eliminated as a basis for customs valuation and yet the incidents of foreign value, such as the ordinary course of trade of selling merchandise for home consumption, would be allowed to control or affect export value. Such a view, it seems to me, would negate the intention to eliminate foreign value as a method of valuation, and would certainly not *simplify* customs administration; it

would *complicate* it. I, therefore, find that evidence as to conditions or practices obtaining in the trade of selling merchandise of the class or kind involved for home consumption in Canada is not probative of any fact necessary to a determination of whether such merchandise was or was not sold 'in the ordinary course of trade' within the meaning of that term, as used and defined in the statute." [Italics quoted.]

Note Senate Report No. 2560, 84th Congress, second session, to accompany H.R.6040, the Customs Simplification Act of 1956.