JOHN V. CARR & SON, INC. v. UNITED STATES (No. 5169)*

United States Court of Customs and Patent Appeals, May 20, 1965

*Barnes, Richardson & Colburn* (*Joseph Schwartz*, of counsel) for appellant. *Stitt and Hemmendinger* (*Noel Hemmendinger*, of counsel) for Amici Curiae. *John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Glenn E. Harris* for the United States.

*C.A.D. 860.

[Oral argument April 5, 1965, by Mr. Schwartz and Mr. Harris]

Before Rich, Acting Chief Judge, and Martin, Smith, and Almond, Jr., Associate Judges

ALMOND, Judge, delivered the opinion of the court:

Appellant, John V. Carr & Son, Inc., appeals the decision and judgment, one judge dissenting, of the Second Division, Appellate Term of the United States Customs Court,[1] affirming the appraisement of certain metal parts for antivibration mounts, exported from Canada on October 6, 1958. Appraisement was based upon constructed value as defined by section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Appellant contends that the merchandise is subject to appraisement on the basis of export value as defined by section 402(b) of the Tariff Act of 1930, as amended, or, in the alternative, that the invoice prices represent the proper constructed value of the merchandise.

The pertinent statutes involved are:

Section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, provides in relevant part:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise ir condition, packed ready for shipment to the United States.

\*     \*     \*     \*     \*     \*     \*

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\*     \*     \*     \*     \*     \*     \*

---

[1] United States v. John V. Carr & Sons, Inc., 52 Cust. Ct. 599, A.R.D. 165.

(f) DEFINITIONS.—For the purposes of this section—
    (1) The term "freely sold or, in the absence of sale, offered for sale" means sold or, in the absence of sales, offered—
        (A) to all purchasers at wholesale, or
        (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise.
without restrictions as to the disposition or use of the merchandise by the purchaser, * * *.

   *       *       *       *       *       *       *

(g) TRANSACTIONS BETWEEN RELATED PERSONS.—
    (1) For the purposes of subsection (c)(1) or (d), as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).
    (2) The persons referred to in paragraph (1) are:

   *       *       *       *       *       *       *

        (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

The record discloses that the three different parts in issue are essential to the construction of antivibration mounts for automobiles. They were manufactured in St. Thomas, Ontario, Canada by the firm of Clevite, Ltd., and sold and shipped to Clevite Harris Products, Inc., of Milan, Ohio, hereinafter Clevite Harris, with appellant, John V. Carr & Son, Inc., acting as customs broker. Clevite, Ltd. and Clevite Harris are subsidiaries of Clevite Corp. of Cleveland, Ohio. Some of the officers and directors of the parent corporation are also officers and directors of the Canadian subsidiary.

Testimony of witnesses, records of shipments and cost analysis adduced by appellant disclosed the following factual situation, as found by the court below:

Clevite, Ltd., is a manufacturer of various parts for both the automotive and agricultural machinery industries. The parts in issue are produced for its own use in the assembly of antivibration mounts, as well as for sale to two Canadian manufacturers who also assemble such mounts. Clevite, Ltd. is the only manufacturer in Canada of this general class of merchandise.

Clevite, Ltd., possessing a capacity to produce parts in excess of those required for Canadian consumption, negotiated for sale of its products

to Clevite Harris, whose primary business is the manufacture of anti-vibration mounts. Witness Jefferies, a director and sales manager for the exporter, testified that he entered upon the intial transaction in conference with the purchasing agent of Clevite Harris at the latter's office in Ohio. A price was agreed upon which was "the highest price that he would pay for these parts, and also the lowest price that we would accept for them." Neither the parent corporation nor the purchaser dictated the prices negotiated nor did they vary by more than one dollar per thousand from prices charged by one or two American manufacturers from whom Clevite Harris purchased similar parts. Jefferies stated that the prices were those that he would have been willing to quote for the sale of identical items to other American buyers. During the period covered by the instant importations, July 1, 1958 to October 31, 1958, there were no other American buyers. Later, however, sales were made to one other United States purchaser at the same price for similar articles.

The negotiated sale of the merchandise was not accompanied by restriction as to disposition or use, nor did prices vary with the quantities purchased. The witness expressed the opinion that the prices included cost of material, fabrication, processing, general expenses and profit, containers and packing, and fairly reflected the market value of the merchandise for exportation to the United States, since it was a reasonable price, comparable to the general price level in the United States.

The record clearly reflects the fact that prices for sales of identical items in Canada were, as the court below found, "considerably higher" than those upon which the exporter relies to support its contention. The court observed that:

Although there is some testimony that a substantial portion of the difference between Canadian and American prices could be accounted for by a much lower volume of sales to Canadian customers and the consequent cost of set-ups or the frequent changing of dies and equipment, as well as certain domestic selling expenses, it seems clear that the method of determining general expenses in computing manufacturing costs was largely responsible for the variance.

Appellant's witness MacVicar, a chartered accountant and comptroller of Clevite, Ltd., in testifying that two sets of figures were prepared, said "when you are exporting there would be certain elements that would not be included in the cost." He defined "certain elements" as "such fixed items of overhead that we would incur in Canada for Canadian production whether we did or did not sell to the United States, such things as taxes, insurance, depreciation, and other fixed elements of that nature that we would incur anyway." Through the accounting system employed by the exporter such "fixed items" were charged only to Canadian operations, and excluded from the computation of export costs.

The record discloses a comparison of overhead cost figures as analyzed by appellant with respect to each of the involved parts:

| Item No. | Canadian Cost Basis | Export Cost Basis |
|----------|--------------------:|------------------:|
| 00132 | 15. 65 | 4. 19 |
| 00586 | 14. 38 | 3. 89 |
| 00652 | 15. 18 | 4. 08 |

The Customs Court referred to what it termed the attitude of the manufacturer in this connection as revealed by the following testimony of the witness MacVicar:

RQ. What was your reason for not including the manufacturing salaries such as foremen and so forth, ·and the items of depreciation, insurance, local taxes, and adminstrative in the Canadian cost and not in the export cost?

*    *    *    *    *    *    *

The Witness: Well, these items to which you are referring are items of a fixed nature in that they do not vary within reasonable limits of production, normal production. They do not vary. We were at that time applying the Canadian market with these certain fixed elements of costs existing. We had additional capacity, we can produce additional products for export purposes without incurring any additional fixed costs.

Judge Mollison: Is that any real reason why you shouldn't allocate to the export part of your business a fair cost with reference to, we'll say, this kind of overhead?

The Witness: Well, we feel that we don't incur these costs in doing export business, and that those costs are absorbed by our Canadian operation.

Judge Mollison: In other words, you put it on the Canadian consumer.

The Witness: Well——

Judge Mollison: Is there any justification for that from a cost accounting standpoint or from an economic standpoint?

The Witness: We feel it's justified.

By Mr. Schwartz:

RQ. Why do you feel it's justified? A. In that if we did not have the export business we would still be incurring exactly the same costs.

RQ. Is that consistent with good accounting practice within your experience? A. I would say yes, sir.

As has been noted, Clevite Harris was an exclusive purchaser of the commodities during the period here relevant. In the light of this fact, the Customs Court agreed with the trial court that the only questionable element was "that arising from the requirement of section 402 (f) (1) (B), supra, that sales to one or more selected purchasers be at a price which fairly reflects the market value * * *."

The trial court asserted the premise that Clevite, Ltd. was *primarily* a manufacturer of antivibration mounts compounded of parts such as those here involved. In finding export value, based on a price which fairly reflected market value, the trial court concluded that the fixed costs assigned by the exporter exclusively to its production for Canadian consumption would not increase because of its exercise of its excess capacity in the production of additional parts for export sale. The trial court reasoned that such practice of cost allocation was

commercially realistic in that the export selling prices thus determined were competitive with prices charged by American firms for the same components.

The Appellate Term disagreed with the trial court's "primarily" initial premise in that there was a "singular lack of evidence" which would tend to show the comparative volume of Clevite, Ltd.'s production of parts utilized in its own operations as against those sold in the Canadian market to other producers. It found that the record showed only that the volume produced for sale in Canada was less than that produced for exportation to the United States, and that the material available for exportation resulted from surplus productive capacity.

In dealing with appellant's contention that the utilization of excess capacity did not result in any increase in the fixed expenses, the Customs Court held that this did not justify the "arbitrary allocation" of such costs to items produced for Canadian consumption.

The court disagreed with the economic theory advanced by appellant that the increase of its over-all output through utilization of its excess capacity did not increase its unit costs of production, stating that from an economic standpoint "it seems axiomatic that as output increases, unit costs decrease."

Relying on the "tenor" of its decision in *United States* v. *Acme Steel Company*, 50 Cust. Ct. 529, A.R.D. 152, affirmed by this court in *United States* v. *Acme Steel Company*, 51 CCPA 81, the court concluded that:

We do see in this record justification for attributing fixed costs solely to production for the Canadian market, when a substantial portion of the firm's business is devoted to export operations.

Accordingly, we are of opinion that a price which does not embrace all of the elements entering into cost of production does not *per se* fairly reflect the market value of the item sold.

We deem it pertinent to here point out the relatively wide variance between Canadian prices of the items under consideration and the prices at which they were sold for exportation to the United States. The record discloses the following in this connection:

| Part No. | Canadian Selling Price | American Selling Price |
|---|---|---|
| 00132 | 42.50 | 33.60 |
| 00586 | 42.00 | 29.15 |
| 00652 | 46.00 | 33.85 |

The Customs Court characterized this variance as a "marked discrepancy" which was not "attributable to expenses indigenous to Canadian operations and sales," and that such imbalance tended to suggest that the .export prices under consideration were not fairly reflective of market values and therefore not within the statutory definition of export value.

The Customs Court found no material efficacy, with respect to export value, in the circumstance cited by the trial court, that export

selling prices were competitive with American prices. In its view the record did not sufficiently establish whether the American prices are such as are consistent with the statutory definition of value, as being freely sold in the usual wholesale quantities and in the ordinary course of trade. The court stated that the market value within the ambit of section 402(f)(1)(B) related to the market value of merchandise exported from abroad and that it was immaterial whether or not the price of such merchandise accords with offerings on the American market, concluding that the record was insufficient to establish statutory export value.

We are in agreement with the Customs Court relative to the tenor of the decision in *Acme Steel*. The importer in *Acme Steel*, as here, contended for export value under the "new law" based upon export sales to a selected purchaser in the United States. Included in the price at which the merchandise was sold for home consumption were certain *selling expenses* which were not incurred in export transactions. The export price differed from the domestic price only to the extent of the value of the *selling expenses*. The deduction, 30 per centum, claimed by the exporter fairly represented the savings in cost effected by the elimination of the several items of selling expenses. The record established that the invoice prices were equal to the sum of the *production costs, general expenses entering into export transactions and profit*, and that such prices fairly reflected the market value for exportation to the United States. The court below, in *Acme Steel*, found substantial evidence of a price embodying all of the material elements entering into the new statutory definition of export value in the case of sales to one or more selected purchasers.

In affirming the decision of the Customs Court in *Acme Steel*, this court stated that it was in harmony with the view expressed by the court below:

* * * that all sales in the ordinary course of trade are proper for consideration in ascertaining the price which fairly reflects the market value of the merchandise * * *.

We think it pertinent to here note that the *selling expenses* involved *in Acme Steel* are, as the appellee points out, basically different in nature from fixed costs of *production* such as here involved.

We do not deem it necessary to enter upon a discussion of the merits or efficacy of the cost allocation accounting system employed by Clevite, Ltd. A substantial portion of the firm's business is devoted to export operations. We agree with the court below that the record here does not justify the allocation of fixed costs solely and exclusively to production for home consumption and that a price which does not embrace all of the elements entering into the cost of production does

not per se fairly reflect the market value of the item sold. We further agree with the Customs Court that the holding in *Acme Steel* that the invoice prices, on the evidence there presented, were equal to the sum of production costs, including material, labor, general expenses entering into export transactions, and profit, which was competent evidence from which a price fairly reflective of market value could be determined, does not warrant, either expressly or by implication, a deduction that "general expenses entering into export transactions may be those items of overhead only which the exporter chooses to include in his calculations."

We think the record here supports the conclusion that the assignment of fixed costs to the extent and in the manner disclosed arbitrarily excludes a fair proportion of overhead expenses relating to cost of production which are reasonably and normally chargeable to export operations. We must therefore affirm the holding of the Customs Court that the record is insufficient to establish statutory export value.

As noted hereinabove, appellant contends, in the alternative, that the invoice prices represent the proper constructed value of the imported merchandise. The appraiser, on the basis that the transaction was between related persons, as defined in section 402(g)(2)(F), and because, in his opinion, the element of general expenses was not an amount "usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement," adopted, as the amount for general expenses, the overhead figures included in the Canadian cost of production basis furnished by the exporter. Appellant's alternative contention for constructed value is that it should be predicated on the shippers' export cost figures from which the elements comprising fixed costs had been deducted.

The court below reasoned that while the amount required by the statute to be added for general expenses and profit is that relating to shipment to the United States, it did not authorize the exporter's "self-serving accounting procedures arbitrarily to exclude from general expenses those costs which it does not choose to allocate to export operations." The court observed that the statutory criterion is not the exporter's general expenses, but those "equal to that usually reflected in sales of merchandise of the same general class or kind * * * by producers in the country of exportation * * *."

Relying on the fact that there were no other producers in the country of exportation of merchandise of the same general class or kind, appellant argues that the exporter's "sales were the only sales and obviously the only sales were the usual sales," and the amount asserted by appellant as general expenses on export sales necessarily reflects amounts usually added for general expenses.

Dispositive of this contention, our views are in harmony with those expressed by the Customs Court:

It is obvious that the statutory definition of constructed value is not open to such a construction, especially in the case of transactions between related persons. Surely, such blanket license to a foreign shipper to estimate costs in accordance with his own peculiar accounting standards is susceptible of depressing the values of imported merchandise and of thwarting the statutory objective of reaching a value as far as possible consistent with that which fairly represents market value. Besides the sale which counsel characterizes as the usual sales are the very sales which have been rejected as being between two or more related persons under common control.

If the method selected by the appraiser to determine general expenses is not the best evidence as to what such amount would have been as between unrelated persons, the record is, nevertheless, barren of any other evidence as to what that amount would be, and a constructed value, different from that returned by the appraiser, has not been affirmatively established here.

We are of opinion, however, in view of the particular facts elicited in the instant case, and of the explanation of the differences between the Canadian costs of production, and of the export costs of production, that the appraiser was fully justified in adopting those amounts for overhead which included the fixed costs, hereinabove referred to, in estimating constructed value for the merchandise here undergoing appraisement.

In our opinion, the record supports the finding of the court below that:

* * * There is no substantial evidence of record to establish export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, nor to show any other constructed values than those found by the appraiser.

We, therefore, *affirm* the judgment of the Customs Court that constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the values of the items under review, and that such values were those returned by the appraiser.

WORLEY, C.J., did not sit but participated by agreement of counsel.

———

RICH, Judge, dissenting.

I note that the four learned Customs Court judges who passed on this case below were equally divided. Like Judge Smith, on consideration of the record I agree with the views of the trial judge and the dissenting judge on the Appellate Term.

The primary question of law before us is whether the proper value is that of section 402(b), *export* value, as held by the trial judge. If it is, we do not reach constructed value of 402(d). As we said recently in the *Acme Steel* case,

If export value can be satisfactorily determined, *no other basis of value may properly be considered.* [My emphasis.]

Export value, as defined in the statute, is value based on sales or offers to sell. It is a "market value" and cost of production has nothing to do with it. Furthermore, section 402(b) speaks not of market value in the principal market of the country of export for *home* consumption but only of sales or offers to sell in the country of export "*for exportation to the United States.*" (My emphasis.) It is an *export* market value.

It seems to me that the court's opinion, like that of the Appellate Term, improperly reaches the conclusion that "the record is insufficient to establish statutory export value" solely on the basis of cost accounting considerations which have a bearing on determining constructed value under section 402(d) but which really have nothing to do with *market* value, which is economically and legally a value which is independent of cost and cost accounting. It is no more tied to cost than the market price of securities on the stock exchange is tied to earnings, dividends or book values. I again emphasize that the only market value with which we are concerned is the section 402(b) *export* value, the *price* at the time of exportation at which the merchandise was freely offered, not for sale in Canada, but *for exportation to the United States.* It seems to me, as it did to the trial judge and Judge Lawrence, that the record is sufficient to establish that that price was the invoice price.

*Market* value is what you can get for merchandise, not what it costs to produce it. It is determined by supply and demand, by what buyers are willing to pay and sellers are willing to take. It may very well be below the true cost of production, at some times, or of some producers, or even below the cost of production of the only producer. But if it exists and if it is established by the evidence, we do not properly reach the issue of cost or the problems of cost accounting to a discussion of which the court's opinion is largely devoted.

The trial judge found that export value existed. His reasons are summarized in the seven points quoted in Judge Smith's dissent. The trial judge pointed out that point six—"that the selling prices were high enough to include the cost of production of such merchandise for export sale, plus a profit"—was the *only* one questioned by the government, which contended the merchandise was sold at less than cost. But even if the government were right, its contention lacks merit for the reason that *market* value under section 402(f)(1)(B) need not represent a profit. Profit is taken into account in constructed value but not in market value. Compare sections 402(b) and 402(d).

As the exporter chose to do its cost accounting, it was satisfied that its export business in the United States was a profitable operation and it was, in fact, selling the merchandise in competition with United States producers. It is competition that controls market value and

price. The Government's true position is that the exporter was not really selling at a profit. But in contemplation of law this is irrelevant if in fact "export value," which was a "market value," was shown to exist. The trial judge said:

> I am satisfied that the record evidence supports the contentions made by the plaintiff with respect to the existence and amount of export value, and, accordingly, I find as facts:
>
> \*      \*      \*      \*      \*      \*      \*
>
> (10) That the said invoiced and entered values fairly reflected the market value of the merchandise.
>
> (11) That the said invoiced and entered values were the prices, at the time of exportation thereof, at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of Canada, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.
>
> I conclude as matters of law:
>
> (1) That export value, as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise, and
>
> (2) That such value is the invoiced and entered value for each item.

In the *Acme* case, which all concerned herein are referring to, we *affirmed* a judgment of the Appellate Term *affirming* the trial court's judgment *sustaining* an appraisement based on export value. In doing *that* we uttered a dictum as follows:

> We find ourselves in harmony with the view expressed by the majority that all sales in the ordinary course of trade are proper for consideration in ascertaining the price which fairly reflects the market value of the merchandise and that evidence of price, and hence of the value of goods *in* the foreign market, is *relevant* to the ultimate determination of the *export* value of imported merchandise within the ambit of section 402(b) of the Tariff Act of 1930, as amended, supra, in the case of sales to selected purchasers. [My emphasis.]

A brief for *amici* "earnestly ask[s] the Court to reconsider or limit" that statement, saying,

> This statement can be read to mean that *home* market price may be considered if there is no other information, outside the particular import transaction, indicating *export* market value; but it can also be read to mean that such data is always relevant. [My emphasis.]
>
> If so broadly interpreted, the quoted statement is by no means required by the definition of "ordinary course of trade" and runs counter both to the language of section 402 in its entirety and the Congressional intent in the Customs Simplification Act of 1956 in establishing export value as the first and principal basis of valuation.

The court now seems to be reiterating that statement but in the context of a case *denying* the existence of *export* value. If the above-quoted dictum is compared with the language of the statute which speaks of a market value "for exportation to the United States," the

relevancy of sales in the home market of the exporting country may well be questioned. The court nevertheless seems to rest heavily on this dictum in looking to the exporter's home market prices as well as details of cost accounting to determine that export prices "were not fairly reflective of market values * * *." But I do not think this is justifiable as the only market value we can concern ourselves with is the price in the export market. I am unable to see the relevancy of either sales in the home market or cost of production nor do I believe that we can base a finding of no export value on either one of them.

I would *reverse*.

---

Smith, Judge, dissenting.

In *United States* v. *Acme Steel Co.*, 51 CCPA 81, C.A.D. 841, we affirmed the Customs Court in finding an export value without regard to the relationship of parent and subsidiary which existed between the importer and the exporter. Here, it seems to me, the issue becomes unnecessarily confused because the record as a whole indicates that examiner Voigt and the two judges constituting the majority of the Customs Court, considering the transactions in issue to be between "related parties," ignored the invoice price as being the "export value" of the imported merchandise.

I agree with the trial judge and the dissenting judge of the Second Division, appellate term, that the invoice price on the present record establishes the "export value" of the imported merchandise. Appellant has established, I think, that an export value existed. The pertinent evidence on this point was correctly summarized by the trial judge as follows:

The exporter was the only manufacturer in Canada of parts for antivibration mounts such as or similar to the parts here involved. It primarily produced such parts for its own use in the manufacture of antivibration mounts, but it also sold such merchandise for home consumption in Canada and for exportation to the United States. Its only United States customer at the time of exportation of the merchandise in issue was the importer of the merchandise at bar.

The principal business of the importer was the production and sale in the United States of antivibration mounts made with the use of parts such as or similar to those in issue. At the time of exportation here involved, such parts were purchased by the importer from United States suppliers as well as from the exporter.

The transaction represented by the present importation was one of a series entered into between the exporter and the importer beginning some 3 months previously, and all under the same conditions and practices as existed in connection with the importation at bar. The prices at which the merchandise was sold were the result of negotiations, and there is testimony that they represented the highest prices the importer would pay for the parts and the lowest prices that the exporter would accept for them. The record indicates a normal buying and selling relationship between the exporter and the importer and shows that

neither the parent corporation nor the importer dictated the prices. Further, it shows that the prices did not vary with the quantity sold, and there were no restrictions as to the disposition or use of the merchandise by the purchaser.

Whether the invoice price properly reflects the "export value" of the imported merchandise turns on whether this price fairly reflects the market value of the merchandise. On this issue, I think appellant should prevail. The evidence, as summarized by the trial judge, shows:

* * * (1) that the transaction was an outright purchase and sale between the exporter and the importer; (2) that the selling prices were arrived at by negotiation; (3) that neither the buyer nor the common parent corporation in any way dictated the prices; (4) that the purchase prices were competitive with prices for similar parts charged by United States manufacturers; (5) that the exporter would have been willing to sell identical merchandise at wholesale to other purchasers in the United States at the same prices; (6) that the selling prices were high enough to include the cost of production of such merchandise for export sale, plus a profit; and (7) that, subsequent to the transaction here involved, the exporter obtained orders from at least one other customer in the United States at exactly the same prices paid by the importer herein.

It is significant, I think, that the Government did not call any witnesses or produce any evidence but instead submitted its case on the argument that since the evidence produced by appellant discloses that the merchandise was sold for exportation to the United States at less than it cost to produce it in Canada, the selling prices did not reflect the fair market value of the merchandise.

It seems to me that the market itself is the best and only place in which to determine market value. The uncontradicted evidence here is that the fair market price, established (albeit by negotiation between "related" parties) and reflected in the invoice price, was determined as the testimony shows as the highest price the importer would pay and the lowest price the exporter would accept. It is significant also that the prices so arrived at were competitive with prices for similar parts charged by United States manufacturers. While not directly pertinent to the issue, there is cumulative significance, I think, in the fact that subsequent to the dates of the importations in issue, the exporter has obtained orders from at least one other customer in the United States for the same merchandise at the same prices here paid by the importer.

If, in fact, the "related parties" aspect of the present case had depressed the invoice prices so that they did not in fact reflect the fair market value, it seems to me that the burden was on the Government to establish this fact. The Government produced no evidence and is necessarily bound by the record as it here appears. On that record there is no basis upon which to find that the invoice price did not reflect the market value of the importer merchandise.

The vagaries of cost accounting procedures and theories afford at best but a tenuous basis for arguing that the invoice price as here arrived at did not fairly reflect the market value of the imported merchandise. Even here, the dispute centers around the item of so-called "fixed costs" which were charged to the Canadian market but not charged to the export market.

The Canadian market price does not necessarily reflect the fair export price for the imported merchandise. Many factors can influence the home market price and while it must not be ignored, neither is it conclusive of what is a fair export price. Here, for example, the export price as determined by the competition existing in the United States market requires an export price which is realistic. On the present record this price is substantially less than the price of the same merchandise on the Canadian market. In the absence of evidence indicating manipulation of the prices, it seems fundamental to me that the only way in which the exporter could sell competing goods in the United States is to do so on a realistic pricing basis. It strains my sense of credulity to believe that any Canadian company would deliberately underprice its merchandise in an export market. Living as I did for so many years as a near neighbor to Canada and bearing as I do the "scars" resulting from numerous professional negotiations for clients with Canadian business men (as operating heads both of wholly U.S. owned subsidiaries and independent Canadian companies), I would be remiss if I did not take judicial notice of their keen business acumen and take this opportunity to pay tribute to it. With this background it would certainly take more than the Government's speculative conjecture here to convince me that the merchandise in issue was exported at a price less than the highest price the Canadian exporter could get for it.

The "fixed costs" item, like the selling expenses in the *Acme* case, may or may not be a proper factor for inclusion in the export price. The evidence here is compelling that such "fixed costs" had been charged to the Canadian market and hence were not a necessary factor in determining the export price. Here again, if this were not the fact, the Government has failed to so establish. Except as we are willing to leave the record and substitute suspicion for fact, there is no basis on which to support the Government's position that such "fixed costs" should have been a necessary part of the export price.

As stated by the trial judge:

It must be remembered that the exporter was itself primarily a manufacturer of antivibration mounts made with the use of parts such as those here involved. Whether or not it made any sales for export, it would incur, in producing such parts for itself, fixed and unvarying items of expense, such as taxes, insurance, depreciation, etc., properly attributable to that primary phase of its business. These fixed costs would not increase because of the production of additional

parts for export sale, and I see no impropriety in the adoption of export selling prices based upon cost calculations from which they have been eliminated which would bar a finding of export value on the ground that such prices did not fairly reflect the market value of the merchandise.

That such practice was realistic from a commercial standpoint is demonstrated by the fact that the evidence shows that the export selling prices were competitive with the prices charged by American firms for the same components, the difference being within less than a dollar per thousand units.

The opinion of the trial judge recites eleven fact findings, supported by substantial evidence of record, which in my opinion require as a matter of law that the export value of the imported merchandise as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the imported merchandise. Appellant has established that the export value is the invoiced and entered value for each item and the Government has introduced no evidence to the contrary.

I would, therefore, *reverse* the appealed decision.