(A.R.D. 162)

INTER-MARITIME FWDG. CO., INC. *v.* UNITED STATES

Entry No. 486807.

Second Division, Appellate Term

(Decided November 26, 1963)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the appellant.
*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector* and *Morris Braverman*, trial attorneys), for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: The instant case is before this division for a review of the decision and judgment of Wilson, J. (Reap. Dec. 10265), sustaining the appraised values of certain woolen sweaters, imported by appellant for the account of Frank L. Savage, Inc., of New York, N.Y. (hereafter called Savage). It is the contention of appellant here, as it was before the trial court, that whereas export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for determining the value of the merchandise at bar, the entered values, rather than the appraised values, properly reflect such statutory basis.

The case is one which calls for interpretation of the revised definition of export value, in the light of the circumstance that the ultimate consignee, Savage, is an exclusive distributor and selling agent for the products of the British firms of W. F. Paine, Ltd., and of Alan Paine of Godalming (hereinafter called Paine), which firms also sell directly

to retail establishments throughout the United States.

The details of the importation and entry of the subject merchandise are covered by stipulation of the parties which recites the following:

1. It is hereby stipulated and agreed by and between counsel for the Plaintiff and the Assistant Attorney General for the United States, Defendant, subject to the approval of the court, that the merchandise under appeal consists of certain wool sweaters, other than cashmere sweaters, exported from England by W. F. Paine, Ltd. (Alan Paine of Godalming), on January 15, 1959, to Frank L. Savage, Inc., New York, N.Y., and that said sweaters were invoiced, entered, and appraised at the following per piece prices in shillings, British currency:

| Quantity | Item | Unit invoice price | Entered price (net packed) | Appraised price (net packed) |
|---|---|---|---|---|
| 6 | #31/6 White Cable Cardigans | 45/0 | As invoiced less 3%___ | 53/0 less 3% |
| 12 | #4525 White Cable Sweaters | 39/0 | As invoiced less 3%___ | 46/0 less 3% |
| 18 | Richard Shetland Pullovers V neck | 31/6 | As invoiced less 3%___ | 37/0 less 3% |
| 5 | Garth Pure Heavyweight Sw. V neck | 153/0 | (Appeal is abandoned as to this Garth item. It is a cashmere sweater.) | |

2. The Inter-Maritime Fwdg. Co., Inc., Plaintiff, is the custom house broker in this transaction.

Section 402(b) of the Tariff Act of 1930, as amended, *supra*, reads as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Subdivision (f) of said section 402 contains the following pertinent definitions of terms used in the valuation statute:

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except * * *.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers, for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

\*          \*          \*          \*          \*          \*          \*

(5) The term "usual wholesale quantities," in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

The record in the instant case consists of the testimony of Frank L. Savage, president of Savage, an affidavit of Alan Paine, managing director of Paine (plaintiff's exhibit 1), physical and illustrative exhibits of the imported merchandise (plaintiff's exhibits 2, 3, and 4), typical orders placed by Savage with Paine (plaintiff's exhibits 5, 6, 7, and 8), a summary showing a comparison of Savage's orders with the number of orders placed on a direct basis by American retailers (plaintiff's exhibit 9), and a report, numbered 3–12, dated November 30, 1960, by James D. Carroll, senior customs representative (defendant's exhibit A).

There is little conflict in the facts adduced. It appears that, since 1947, Savage has been serving as selling agent and exclusive United States wholesaler-distributor for all of Paine's woolen and cotton outerwear products, but there is no other relationship between the two firms. Paine also sells to retail shops throughout the United States on a direct purchase basis. Sales to Savage are in quantities of 500 garments or more per style, at list prices, less 10 per centum wholesale distributor discount, less 5 per centum for wholesale quantities, and delayed delivery, less 3 per centum for payment within 30 days. Orders from retail shops are usually for quantities of 36 garments per style, but sometimes, as where 1 buyer purchasers for several stores, quantities of 100 garments per style are supplied. Prices to retail stores are at list, less 3 per centum for payment within 30 days. On all sales to retailers, Savage receives a wholesale distributor's commission of 10 per centum in the case of wool outerwear and 7½ per centum in the case of cotton outerwear, whether or not Savage has had any connection with the transaction. There are no restrictions on Savage or any other United States purchaser as to disposition or use of merchandise sold by Paine.

The record further reveals that, during 1958 and 1959, a greater quantity of wool and cotton outerwear was sold directly to retail buyers, than to Savage, in the proportion of approximately 64 percent to 34 percent. However, during certain seasons of the year, sales to Savage predominate. This is occasioned by seasonal purchases of such items as woolen sweaters by retailers, whose orders are generally placed after the first day of the year and through April for delivery from May through October. Late in August, Savage places what were described as bulk production orders to maintain continuous factory operations during what would otherwise be a slack season. Such bulk production orders are in addition to so-called regular wholesale orders, as well as to certain described special label orders for Savage's customers.

Arrangements with respect to bulk production orders are such that Savage is required to take delivery of all goods ordered, but Paine reserves the right to hold back as great a quantity as necessary to supply the needs of retail customers purchasing on a direct basis. This was described as a service which helps to benefit Paine's business.

Mr. Savage's testimony indicates that his company originally represented Paine strictly as a wholesaler, but became a selling agent after Paine initiated the practice of direct selling to retailers. The stock of goods which Savage purchases is available in New York to fill additional orders, at a slightly higher price, from retailers who had previously purchased directly from Paine, as well as for wholesale sales made for Savage's own account. Mr. Savage maintained that this servicing feature to Paine's direct customers was incidental to his own company's wholesale distributing business and that if he relied on fill-ins, and there was a bad season, he would be out of business. He admitted, however, that the ability of a retailer to place supplemental orders in New York created a distinct competitive advantage over foreign manufacturers who could not provide such a service.

Mr. Savage further testified that although he knows the people who are wholesale purchasers of men's sweaters, he does not come in contact with them extensively or frequently. Nevertheless, he believed that the selling commission of 10 per centum and the wholesale discount of an additional 5 per centum were established discounts which were quite normal and quite fair, and that "when you buy wholesale and you have to be responsible for all the selling [and some of the advertising], it is not right to buy at wholesale when it already would have a selling commission included."

The record also reveals that Paine sells domestically in England, as well as to other countries than the United States, and that, except where it was represented by selling agents, its own sales staff handled all transactions. Sales were made only to retail shops, at list prices,

less 3 per centum. However, if selling and advertising expenses, which costs were estimated at 14.3 per centum in the case of its wool products, were deducted from the sales price, the net return to Paine would approximate the net selling price to Savage.

Both here and in the trial court, counsel for appellant has contended that prices paid by Savage represented true statutory export value, since Savage is a selected purchaser at wholesale and sales were made to it at prices which fairly reflect the market value of the merchandise involving the intendment of section 402(f)(1)(B), *supra*.

It was the position of the Government before the trial court that the only purchasers at wholesale to whom the subject merchandise was freely offered for sale for exportation to the United States were the retailers who purchased for resale to ultimate consumers. It was urged that before sales to selected purchasers at wholesale could be considered, it must first be determined whether there are any purchasers at wholesale within any of the categories encompassed by section 402(f)(1)(A), as interpreted by section 402(f)(3), and, moreover, that sales to Savage were not in the ordinary course of trade within the intendment of section 402(f)(2), *supra*. Before this court, counsel for appellee confines its argument to the premise that sales to Savage "were not in the ordinary course of trade to a selected purchaser at prices which reflect the market value of the merchandise."

Specifically, it is the contention of appellee that the arrangments between Paine and Savage which required the latter to take all merchandise which it ordered, but permitted the former to retain enough goods to satisfy the needs of its direct purchase customers, and also the ability of retail purchasers to obtain additional supplies of merchandise from Savage in New York constituted an unusual course of dealings between the two which was not shown to be normal in the trade involving the exportation of woolen knitwear to the United States, citing *Chr. Bjelland & Co., Inc.* v. *United States*, 45 Cust. Ct. 435, Reap. Dec. 9753.

The trial court resolved the issues in the case favorably to the arguments advanced by appellee. In holding that sales by the manufacturer directly to retailers who purchased for resale to consumers should be taken as the basis of appraisement, the trial court rejected sales to Savage as not being in the ordinary course of trade, owing to the special arrangements between Paine and Savage, stating—

\* \* \* While it may be that the importer's sales arrangements with the shipper were normal and ordinary as between them, such arrangements to be conclusive as to a finding of "ordinary course of trade" in the determination of value must be that which is normal in the trade such as here generally.

The court further held that the existence of an exclusive purchasing arrangement between the seller and the importer was contrary to the

concept of a free offering to *all* purchasers at wholesale, and when there are shown to be other purchasers at wholesale, to wit, those who purchase for resale who buy in the usual wholesale quantities, such category takes preference over a selected purchaser. Determining that the instant record establishes that "the greatest aggregate volume of merchandise was sold by the exporter herein direct to United States buyers other than the importer. This situation, in my opinion, establishes the 'usual wholesale quantity' to be that quantity purchased by the direct buyers," the court sustained the appraised values.

In the view that we take of the instant case, we are inclined to agree that the primary question to be resolved is whether or not sales to Savage were made in the ordinary course of trade, since this is a condition which attaches to permissible consideration of sales to one or more selected purchasers by the explicit terms of section 402(f)(1)(B), *supra*. It must be remembered that the revised definitions of value, enacted into law by the Customs Simplification Act of 1956, leave untouched the statutory presumption that the value found by the appraiser is the value of the merchandise, unless proven otherwise by the party who challenges its correctness, 28 U.S.C., section 2633. To successfully upset the appraiser's return, a party must establish not only that the appraiser's action was erroneous, but that the claimed value is proper, and, in so doing, must meet all of the material issues in the case. It does not suffice to show that the appraiser's finding is incorrect, if all of the essential elements of the claimed value have not been proven (*Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495, and cases cited therein). And a material element in the determination of whether sales to a selected purchaser at wholesale fall within the statutory definition of the term "freely sold" is whether or not such sales are made in the ordinary course of trade.

Accordingly, whether or not a selected purchaser at wholesale, that is, one who buys for resale otherwise than at retail, takes precedence over all other purchasers for resale who buy in the usual wholesale quantities, in view of the text of section 402(f)(3), *supra*, is beyond the scope of this inquiry, if sales to the selected purchaser are not in the ordinary course of trade, or were made at prices which do not fairly reflect the market value of the merchandise.

The term "ordinary course of trade" itself the subject of statutory definition has been construed in the light thereof as reflecting conditions and practices which are normal and usual in the trade involving the sale, in the country of exportation of merchandise such as or similar to the merchandise undergoing appraisement. *Chr. Bjelland & Co.* v. *United States*, *supra*; *United States* v. *Acme Steel Company*, 50 Cust. Ct. 529, A.R.D. 152 (appeal pending). Seemingly, therefore, evidence of the manner in which one exporter conducts his business does not necessarily establish what is normal or usual in the trade under

consideration. The practices of others engaged in the same class of trade are relevant and material elements in creating a picture of what constitutes the ordinary course of trade in the purchase and sale of the class of merchandise involved in an appraisement proceeding.

While there is some evidence in the instant record purporting to show that the discounts received by Savage from the exporter's list prices were customary allowances in the men's sweater trade, it is questionable whether that evidence is supported by competent proof predicated upon actual knowledge of existing conditions. The witness' statements to that effect were, in the main, expressions of his belief, not founded upon any very extensive contact with other wholesale buyers of men's sweaters. Moreover, the fact that Paine's selling practices—its direct transactions with retailers, its special arrangements with Savage, the ability of retailers to supplement their orders by purchases from Savage in New York—had the effect of conferring a competitive advantage over other suppliers of men's sweaters, tends to controvert the assertion that transactions between Savage and Paine were conducted in the ordinary course of trade.

In any event, other than the statements heretofore alluded to, which we hold to be without probative value, the record is barren of affirmative proof of how other British shippers of men's woolen sweaters conducted their businesses with American purchasers. Since the ordinary course of trade has not been shown, and there is nothing in the record from which it may reasonably be inferred, no determination of whether sales to the instant importer, admittedly a selected purchaser, were conducted in the ordinary course of trade is possible.

We are of opinion, therefore, that a material element of proof in the burden assumed by appellant is lacking and that the presumptively correct values returned by the appraiser have not been overcome.

Accordingly, the court makes the following findings of fact:

1. That the merchandise involved herein consists of wool sweaters, exported from England on or about January 16, 1959.

2. That, on or about the date of exportation of the subject merchandise, the importer herein was the exclusive agent of the manufacturer for the sale and distribution of the manufacturer's merchandise in the United States, for sales otherwise than at retail.

3. That, at all times pertinent hereto, the manufacturer and exporter of the instant merchandise sold such or similar wool sweaters directly to American retailers who purchased for resale.

4. That the appraised values represent the prices at which the manufacturer sold to American retailers.

5. That the entered and claimed values represent the prices at which the exporter sold to its exclusive agent, the importer herein.

6. That the record is lacking in affirmative proof of the ordinary

course of trade pertaining to the sale of merchandise of the class of the subject wool sweaters.

Predicated upon the foregoing findings, this court makes the following conclusions:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise here involved.

2. That the evidence is insufficient to overcome the presumptively correct values returned by the appraiser.

3. That the judgment of the trial court sustaining the appraised values should be affirmed.

Judgment will be entered accordingly.