(R.D. 11157)

INTER-MARITIME FORWARDING CO., INC. v. UNITED STATES

Entry No. 878535.

(Decided March 30, 1966)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Harold L. Grossman* and
*Morris Braverman*, trial attorneys), for the defendant.

WILSON, Judge: The importation at bar consists of certain wool
sweaters, cardigans, and pullovers exported from England on or about
January 10, 1959. The exporter-manufacturer is W. F. Paine, Ltd.,
Alan Paine of Godalming (hereinafter called "Paine"). The plain-
tiff herein is the customhouse broker for the importer of the merchan-
dise, Frank L. Savage, Inc., of New York, N.Y. (hereinafter called
"Savage").

It is not disputed that the proper basis for appraisement is export
value, as defined in section 402(b) of the Tariff Act of 1930, as
amended by the Custom Simplication Act of 1956, T.D. 54165.

The merchandise was invoiced, entered, and appraised at the fol-
lowing per piece prices in shillings, British currency, all prices being
less 3 percent:

| | Number and item | Invoiced and entered | Appraised |
|---|---|---|---|
| 4525 | White Cable Sweaters* | 39/0 | 46/0 |
| 31/6 | White Cable Cardigans* | 45/0 | 53/0 |
| — | Richard Shetland Crew Neck Pullovers* | 31/6 | 37/0 |
| — | Carlton Lambswool Cardigans | 40/0 | 48/0 |
| — | Chester Lambswool V-Neck Pullovers | 31/6 | 37/0 |

*These are the same items as were involved in R59/8046 referred to *infra*.

At a hearing of this case in chambers, the record in *Inter-Maritime
Fwdg. Co., Inc.* v. *United States*, R59/8046, decided by this court in
favor of the defendant in 48 Cust. Ct. 670, Reap. Dec. 10265, affirmed
by the second division, appellate term, in 51 Cust. Ct. 529, A.R.D. 162,
was incorporated herein on plaintiff's motion. Plaintiff also limited
its appeal herein to the five items specified *supra*.

In Reap. Dec. 10265, this court stated:

* * * While it may be that the importer's sales arrangements with
the shipper were normal and ordinary as between them, such arrange-
ments to be conclusive as to a finding of "ordinary course of trade" in
the determination of value must be that which is normal in the trade
such as here generally. *Chr. Bjelland & Co., Inc.* v. *United States*,
45 Cust. Ct. 435, Reap. Dec. 9753. The record does not disclose that
the latter situation was prevalent in the case at bar. * * *

The appellate term in A.R.D. 162 stated:

In the view that we take of the instant case, we are inclined to agree
that the primary question to be resolved is whether or not sales to

Savage were made in the ordinary course of trade, since this is a condition which attaches to permissible consideration of sales to one or more selected purchasers by the explicit terms of section 402(f)(1) (B), *supra.* * * * And a material element in the determination of whether sales to a selected purchaser at wholesale fall within the statutory definition of the term "freely sold" is whether or not such sales are made in the ordinary course of trade.

The appellate term also indicated that the term "ordinary course of trade" has been construed to reflect conditions and practices which are normal and usual in the trade involving the sale, in the country of exportation of merchandise such or similar to the merchandise undergoing appraisement, and cited *Chr. Bjelland & Co., Inc.* v. *United States, supra,* and *United States* v. *Acme Steel Company,* 50 Cust. Ct. 529, A.R.D. 152, subsequently affirmed in *Same* v. *Same,* 51 CCPA 81, C.A.D. 841. The appellate term stated that the manner in which one exporter conducts his business does not necessarily establish what is normal or usual in the trade under consideration and that the practices of others engaged in the same class of trade are relevant and material elements of what constitutes the ordinary course of trade therein. Hence, the court held that the ordinary course of trade was not shown and that no inference could be drawn that the sales of the instant importer were conducted in the ordinary course of trade.

At the trial of the current case, counsel for plaintiff stated:

In the incorporated case, which was previously decided in A.R.D. 162, as well as, your Honor, in the decision before the trial Court, indicated that we had not established that the practices of the importer herein, Frank L. Savage, were normal in the trade; in other words, this Court and the Appellate Term both held that we had not established that the practices between Frank L. Savage, the importer, and Paine of Godalming were normal and in the ordinary course of trade.

My testimony this morning will be directed primarily toward clarifying and overcoming that deficiency. The testimony of the witnesses this morning will be primarily to establish that as—I quote from the Appellate Court—"the practices of others engaged in the same class of trade are relevant and material elements in creating a picture of what constitutes the ordinary course of trade in the purchase and sale of the class of merchandise involved in an appraisement proceeding."

Plaintiff's brief, filed herein, states:

The new evidence in this case is confined to an effort on the part of Plaintiff to establish that the arrangements and practices between Alan Paine of Godalming, the foreign seller, and his exclusive U. S. wholesale importer, Frank L. Savage, Inc. were normal for the "same class or kind" of merchandise. * * *

Accordingly, as the issue is here presented, the question to be decided is whether the importer has established by satisfactory evidence that others in England who are engaged in the same class of trade as Paine

have adopted the same practices as Paine in doing business with United States purchasers so as to constitute such practice as in the "ordinary course of trade" as that term is defined in section 402(f)(2) of the amended tariff act, *supra*.

The pertinent provisions of the tariff act considered are as follows: Section 402(b) of the Tariff Act of 1930, as amended, *supra:*

(b)   EXPORT VALUE.—For the purposes of this section the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f)(1) of the tariff act, as amended, *supra:*

(f)   DEFINITIONS.—For the purposes of this section

(1)   The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A)   to all purchasers at wholesale, or

(B)   in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, * * *.

Section 402(f)(2) of the tariff act, as amended, *supra:*

(2)   The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

In the incorporated case, the record, as gleaned from the above decisions, disclosed that Savage was the exclusive United States wholesale seller of products manufactured and shipped by Paine since 1947; that Savage received a wholesaler distributor's commission of 10 per centum on sales made by Paine of wool outerwear to United States retail stores whose buyers purchase abroad from the manufacturer whether or not Savage had any connection with the transaction; that such buyers may also purchase from Savage, delivery being made from stock carried on so-called regular wholesale orders, or on "bulk production orders" which Savage had placed with Paine to maintain continuous factory operations during slack season; that prices paid by Savage to Paine on "bulk" orders are list prices, less 10 per centum wholesale distributor's discount, less 5 per centum discount for whole-

sale quantities, and less 3 per centum for payment within 30 days. There are no restrictions on Savage or any other United States purchaser as to disposition or use of merchandise sold by Paine. On "bulk" orders, Savage is required to take delivery of all goods ordered, but Paine reserves the right to hold back as large a quantity as necessary to supply the needs of retail customers purchasing on direct basis from Paine.

In order to clarify and overcome the deficiency, if possible, in proof in the incorporated case regarding the "ordinary course of trade," plaintiff produced three witnesses who testified in its behalf.

Gotthold Kuehnert, president of A. Kuehnert & Co., Inc., importer and wholesaler of knitwear consisting of sweaters, underwear, hosiery, etc., since 1899, stated that he has been with the firm for about 40 years; that it sells to department stores and men's specialty stores; that it handles imported men's knitwear on a commission basis; and is the sole agent in the United States for J. D. McGeorge, Dumfries, Scotland; Midland Hosiery Co., Leicester, England; Bon Soir Pajamas, London, and three firms in Switzerland, Cimmeli, Pabhols, and Entoess. The Kuehnert firm is the only wholesale purchaser in the United States for the products of the six firms, is not related to any of them, and there is no restriction as to disposition or use.

Kuehnert Co. sells on direct import to retailers in the United States from the McGeorge mill in Scotland, on which sales a commission from 7½ to 10 percent is received. McGeorge also sells directly to retail stores in the United States, and Kuehnert Co. receives a commission thereon. Kuehnert Co. also buys quantities from McGeorge for their own account "which is back-up stock in New York for immediate delivery to the various stores." Bulk minimum stock orders for at least 500 pieces are placed well in advance of shipments to carry the manufacturer over the slack period. On stock purchases, Kuehnert Co. receives 10 percent commission off list price, plus 3 or 4 shillings, which may amount to 5 percent. They also receive a 3 per cent discount on 10 days or 2½ percent on 30-day payment. Mr. Kuehnert testified that "there is certain bargaining between us." The arrangements with McGeorge were in effect in 1958 and 1959. A United States wholesale jobber could not purchase from a firm with which Kuehnert had agency arrangements, but could purchase competitive merchandise from other manufacturers.

The witness stated that he had the same arrangements with other firms (not named), some dating back to 1918, 1922, and 1923, which continued except during the war period and started again in 1945 or 1946. He regards his exclusive arrangements with the six firms as being normal in the men's knitwear trade and that his ability to buy stock, and to resell for his own account, is a servicing feature

as well as a wholesale feature. He stated that he had read the decision in A.R.D. 162, *supra*, and that his arrangements as exclusive seller are the same as those between Savage and Paine. He also regards the commissions received by Savage as normal in the men's import wholesale knitwear trade.

Under cross-examination, Mr. Kuehnert testified that only McGeorge of the six firms manufactures and sells men's woolen sweaters, that Kuehnert Co. receives 10 percent commission on orders anyone places with McGeorge; that upon inquiry of and approval by Kuehnert Co., McGeorge could fill orders by United States purchasers out of bulk orders placed by Kuehnert Co., though not then the latter's customer, because Kuehnert Co. would still get their commission under the sole selling arrangements for all goods shipped to the United States whether orders were placed in New York or in London. In the latter case, the customer remits to McGeorge who pays the 10 percent commission to Kuehnert Co.

Little, if any, credence can be given to arrangements by Kuehnert Co. with Midland Hosiery Co. or with Bon Soir Pajamas, selling, respectively, hosiery or pajamas, in connection with ascertaining the "ordinary course of trade" in the sale of men's wool sweaters. Mr. Kuehnert's testimony regarding the three Switzerland firms and an unnamed Austrian firm is not considered as relevant in valuation proceedings in respect to importations from England. Section 402(b), as amended, *supra*, relates to export value "in the principal markets of the country of exportation." Subdivision (f)(5) of said section 402 refers to the term " 'usual wholesale quantities' * * * in the market under consideration * * *." These are not ambiguous terms and mean, as to the case at bar, the markets of England and not to any market in any foreign country.

Robert L. McCall, a director of F. A. MacCluer, Inc., a manufacturer of sport shirts, and a wholesale seller of imported sweaters for about 50 years, testified that he has been in the line for 18 years. MacCluer sells to the retail trade, department stores, specialty stores, and smaller men's stores. It handles imported sweaters manufactured by Jaeger Company, Ltd., of London (hereinafter called "Jaeger"), and has an exclusive arrangement as selling agent for the United States. MacCluer also brings in, carries, and manages a stock of certain styles of Jaeger sweaters which are *not* owned by MacCluer, but are obtained on *consignment* from Jaeger. MacCluer receives 11 percent commission of the total list prices on all orders booked by it or by Jaeger in England for direct shipment to its United States retail customers. MacCluer received 10 percent commission on goods sold from stock held by it on consignment when sold to

United States purchasers, plus 5 percent as a warehousing charge, plus 2 percent increment to take care of the discount for retail stores.   The witness stated that the motivating reason for MacCluer getting into its arrangement was that "other people were doing, in essence, the same thing"; that it is common knowledge in the trade and he regards it as normal.   MacCluer is not related to Jaeger in any way and the latter has no restrictions as to disposition or use over sales made by MacCluer.   Orders for stock on consignment are placed well in advance with Jaeger, prior to delivery, in order to know what it will have for sale and to give the mill production continuity.   In 1958, MacCluer was involved *only* as an importer and *not* in a stock consignment arrangement which came into existence early in 1960.   The witness stated that he read the decision in A.R.D. 162 and that he regards the discounts and commissions referred to therein as normal in the men's wholesale knitwear trade; that his arrangement is "somewhat similar * * * in a little different way," but that the operation is basically the same, and from his experience he knows other people in the trade have similar arrangements, some going back to the middle 1950's.

Under cross-examination, Mr. McCall testified that other English manufacturers of men's woolen sweaters are Paine; Coxmore; McGeorge; Pringle Co.; Ballantine; and many, many more smaller mills; that MacCluer, on or about January 10, 1959, was the sole selling agent in the United States for Jaeger and responsible for distribution of Jaeger products; that MacCluer "sold strictly on a direct from England to retail store basis" and was paid a commission. Early in 1960, that method of business changed, and MacCluer thereafter placed orders with Jaeger for definite quantities of sweaters and was responsible for their distribution.   The sweaters did not thereby become the property of MacCluer, but were on consignment, Jaeger being paid therefor as the sweaters were sold out of stock thus carried by MacCluer.   MacCluer never paid for such an order *per se*, but only when goods were sold.   McCall considers that MacCluer is an exclusive agent for Jaeger.   He testified that the 10 percent, 5 percent, and 2 percent regarding stocked merchandise are based upon MacCluer's selling price to the customer in the United States; that his arrangement is being practiced in the trade and "is basically and fundamentally the same" as is engaged in by Savage.   He admitted that Savage pays Paine for merchandise ordered, while MacCluer pays for ordered merchandise "only after it is sold"; that the percentage arrangements were the same as those of Savage, but the other arrangements differed in that Savage owned stocked goods while MacCluer did not, in the strict sense of the word, own Jaeger goods

which it stocks; that if goods are sold "off price," MacCluer's commission diminishes or it may not get a commission when merchandise is not sold for one reason or another. He stated that if Savage had a similar situation where stocked goods were not sold, Savage would suffer a financial loss.

The testimony of Mr. McCall was not always specific as to periods of time with reference to the various methods that MacCluer did business with Jaeger. Seemingly, MacCluer was only an importer in 1958, sole selling agent in 1959 on a commission basis on direct shipments from England to retail stores, and early in 1960, MacCluer placed consignment orders.

F. Lennard Appleby testified that he is connected with Robert Appleby & Co. who are importers, agents, and distributors for British weatherwear and garnishingwear. The firm is new in the knitwear field and has been handling it only since the end of 1961 or from 1962. He stated that he heard the testimony of Kuehnert and McCall and that his firm's arrangements "are essentially the same. They differ, perhaps, in the bartering amounts"; that, on the first sample from Monroe Spun, Ltd., Edinburgh, Scotland (hereinafter called "Monroe"), he received 10 percent commission on all sales made for direct import by retailers, whether the order was booked by Appleby Co. in New York or by Monroe abroad; that they purchased considerable quantities for their own account at the selling price, less 15 percent, the merchandise being predominantly Shetland sweaters; that there is no relationship between Appleby Co. and Monroe; and that there are no restrictions as to disposition or use. Arrangements were worked out with Monroe as a result of knowledge gained from what other manufacturers had worked out with their agents and representatives in the past. Mr. Appleby regards his arrangements as normal in the sweater trade from England. He testified that at present (he testified on December 15, 1964) Appleby Co. purchases considerably more for its own account than is sold to retailers direct; that it takes care of reorders for accounts that purchase directly from Monroe. He testified that from his travels in the United States since 1955 and from his travels abroad since 1956, he has come into contact with other manufacturers and selling agents and thereby knows of arrangements between them. He regards the arrangements between Savage and Paine as normal in the men's sweater trade, although in 1958 and 1959, he was not selling men's knitwear, but was selling to the men's wear trade, thereby becoming familiar with the knitwear field, and was aware of arrangements similar to those he now has and which Savage had in 1958 and 1959.

Under cross-examination, Mr. Appleby testified that he heard Mr. McCall state the names of other British manufacturers of men's knit-

wear; that he knows others named Smedley; Turner, Rutherford; J. A. Robinson; and Braemar, all being large factories; that he placed an order with Monroe in 1961 for 1962 delivery; that he received a 15 percent discount; that Monroe had the right to take merchandise he ordered and sell it to a customer who came to England for direct exportation; that the servicing feature is the lesser portion of trade, the majority being sales for profit made by themselves. He also testified that the arrangements for percentages and for payment differ between various manufacturers and agents; that his arrangement is not one on consignment, as Appleby owns the merchandise "from the day they get here, or they arrive." He further stated that on his sales from stock he makes a profit and does not get commission. His discount is 15 percent "off the manufacturer's selling price," which is different from the arrangement McCall stated was based on the sales price to the American customer.

Appleby Co. was not in the knitwear business in 1959 but entered that field at the end of 1961 or in 1962. Mr. Appleby learned of Savage's arrangements in 1958 and 1959 while he was selling in the men's wear trade.

The issue herein, as already noted, *supra*, is whether the evidence contained in the record in the incorporated case, supplemented by the testimony of the three witnesses who testified herein, as substantially detailed above, discloses practices which are normal and usual and in the "ordinary course of trade" in respect to the purchase and sale in the country of exportation, England, of merchandise of the same class of trade as sweaters, cardigans, and pullovers, the merchandise here under consideration.

The statement by Kuehnert, McCall, and Appleby that each considers his exclusive arrangements as normal in the trade is not entitled to much, if any, credence. The statement by each of these witnesses is merely his own conclusion of an ultimate issuable fact and cannot be regarded as substantial evidence. *Brooks Paper Company* v. *United States*, 40 CCPA 38, 44, C.A.D. 495. What is normal in the trade is a question of fact to be deduced by satisfactory evidence, upon which the court is to decide the question of normality.

It will be recalled that the decision of this court (Reap. Dec. 10265) alluded to the importer's sales arrangements with the shipper (Savage and Paine), and that such arrangements were not conclusive to a finding of "ordinary course of trade" unless it were shown that such arrangements were normal in the trade such as here generally.

In affirming the above decision, the appellate term stated (A.R.D. 162) that the record was barren of affirmative proof of how other British shippers of men's woolen sweaters conducted their businesses with American purchasers.

The present record shows that Kuehnert was the exclusive agent for only one sweater manufacturer in England, namely, McGeorge. While Paine could sell directly to United States purchasers with whom Savage had no previous selling experience, McGeorge could not sell to United States buyers without obtaining Kuehnert's prior approval. Kuehnert's arrangements were arrived at through bargaining. MacCluer was an importer in 1958 and a selling agent in 1959, and in 1960 did not purchase sweaters from Jaeger as shipments were made by Jaeger to MacCluer on consignment. MacCluer did not own the consigned merchandise but paid for it only after it was sold in the United States. Savage and Kuehnert owned the merchandise they obtained from their respective English principals and took the risks of ownership. Appleby's business relationship with Monroe in respect to men's knitwear trade did not commence until 1961 or 1962, whereas this case is concerned with exportations on or about January 10, 1959. Appleby also "bartered" as to amounts. Mr. Appleby's experience since 1955 referred to the men's wear trade as distinguished from the men's knitwear trade during 1958 and 1959. His testimony relates to a point of time remote from the date of exportation, and his knowledge of the trade in 1958 and 1959 was obtained from others. Thus, the testimony in the case at bar does not aid in ascertaining what is normal and usual and in the "ordinary course of trade" relating to men's wool sweaters exported from England on or about January 10, 1959.

Aside from the variations in the methods or practices of conducting business by Savage, Kuehnert, MacCluer, and Appleby with their respective exporters, Paine, McGeorge, Jaeger, and Monroe, as disclosed by the record, it is noted that there are at least six *other* large manufacturers of woolen sweaters in England, to wit, Coxmore; Pringle Co.; Ballantine; Turner, Rutherford; J. A. Robinson; and Braemar, as well as "many, many more smaller mills." While witnesses for plaintiff knew these named firms, no evidence was offered to establish that their practices in the trade in disposing of their merchandise to United States purchasers were in line with the practices alleged by any one of plaintiff's witnesses.

In *R. J. Saunders & Co., Inc.* v. *United States*, 55 Cust. Ct. 666, Reap. Dec. 11099 (decided November 8, 1965, and not appealed), the merchandise was Thiourea, a chemical manufactured by Miike Gosei Chemical Industry Co., Ltd., of Japan, which was exported by Nippon Trading Co., Ltd., the exclusive export agent of the manufacturer. Appraisement was on the basis of foreign value, as defined in section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. The importer claimed United States value, as defined in section 402a(e) of said amended act. This court

stated that the affidavits relied upon by plaintiff in support of its contention that a foreign value did not exist related to the business practices of only three manufacturers of Thiourea, and that there was no proof that they were the only manufacturers of such or similar merchandise in Japan, or were the only manufacturers which offer "such" or "similar" merchandise for home consumption; that there were no other manufacturers or sellers which freely offer and sell such or similar merchandise for home consumption. Even assuming that the trade practices of the three manufacturers were as stated in their respective affidavits, the court stated that it did not necessarily indicate the trade practice generally, and does not establish that "similar" merchandise by other dealers or manufacturers was not freely offered or sold for home consumption. The court further stated:

* * * No probative evidence has been introduced showing that said three Japanese manufacturers and their exclusive export agents for the sale of Thiourea for exportation to the United States were the only Japanese manufacturers and/or the only Japanese exporters of such or similar Thiourea to the United States. It has likewise not been established that other dealers or manufacturers of similar merchandise did not freely offer or sell their product for exportation to the United States. * * *

The foregoing observations are apropos in the case at bar. The record herein does not establish that the six named other large manufacturers of such or similar wool sweaters in England disposed of their products to the United States in substantial accord with the practice employed in such trade by either Paine, McGeorge, Jaeger, or Monroe. Accordingly, without such evidence, it is not possible to find that the "ordinary course of trade" generally is that practiced or indulged in by either of the above-named exporters.

In *Hudson Shipping Co., Inc.* v. *United States*, 43 CCPA 19, C.A.D. 604, phthalic anhydride was appraised on the basis of American selling price, as defined in section 402(g) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, 52 Stat. 1081. The importer contended that such appraisement was erroneous, though not denying that a similar competitive product was produced in the United States. The importer sought to prove that on the dates of exportation of the shipment, there existed a market condition for the domestic product which made it impossible to find an "American selling price" which met the definition of the statute. The trial judge, in his decision in the *Hudson Shipping Co.* case, *supra*, 31 Cust. Ct. 419, Reap. Dec. 8266, stated that the testimony of the customs examiner, called by plaintiff, that he contacted four of nine major manufacturers of domestic phthalic anhydride would not, standing alone, establish the plaintiff's claim. The trial court held that plaintiff failed to make

out a *prima facie* case, and entered judgment affirming the value returned by the appraiser. In affirming the above judgment, the second division, appellate term, in 33 Cust. Ct. 602, A.R.D. 53, stated the evidence showed that there were at least nine domestic producers of phthalic anhydride; that the importer and other prospective purchasers contacted only four of them and also had knowledge that a fifth producer was not manufacturing at the time involved due to a plant casualty. The court stated:

This record contains no evidence that the other five domestic producers of phthalic anhydride were not freely offering for sale for domestic consumption phthalic anhydride within the provisions of said section 402(g). It is our view that such evidence falls far short of establishing a *prima facie* case, * * *.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Should we accept the evidence herein as establishing that the firms solicited for offers were not freely offering phthalic anhydride within the terms of said section 402(g), it would be necessary to assume that the firms not solicited were not freely offering said merchandise within the terms of said section 402(g), in order to hold that appellant had made out a *prima facie* case. This we may not do. "The courts may not properly supply from imagination the essentials in which the proofs are deficient." *United States* v. *Malhame, supra* [19 CCPA 164, T.D. 45276]. [Italics quoted.]

On further appeal by the importer, the Court of Customs Appeals, affirmed in C.A.D. 604, *supra*, indicated that the evidence showed there were nine domestic producers of phthalic anhydride and that importer's witnesses contacted five major producers. The court stated "that there seems to be no good reason to limit those who could make a free offer to producers alone. The *owner* of phthalic anhydride, though not a producer, could presumably make a free offer to all purchasers." The court also stated:

It may be argued, of course, that proving the situation of each and every producer and owner is an insurmountable task, and one not required by the law, and that proof of the situation of the *major* producers is sufficient to raise a rebuttable inference that the situation is the same with the other producers and owners. So we understand appellant to argue. Such an inference is of course a permissible one in certain circumstances, but the realities of economics militate against it here. * * * For these reasons, proof that the so-called "major producers" are unable to supply all demands at their price does not raise a permissible inference that *no one* having control of the product is freely offering it to all purchasers at a price where the demand does not exceed the supply. * * *

Thus, we hold that, in order to make out a *prima facie* case that there was no price at which phthalic anhydride was freely offered to all purchasers (under the conditions of this case) appellant had the burden of producing evidence tending to show that not one producer

or owner of phthalic anhydride was freely offering the product to all purchasers at any price. * * * Thus we hold that importer had the burden of introducing evidence tending to prove that *no* producer or owner of phthalic anhydride was freely offering it for sale at any price, * * *.

Furthermore, we may note that even the proof offered with regard to the situation of the five major producers is far from satisfactory. * * * [Italics quoted.]

Applying the several enunciations by the Customs Court and the Court of Customs and Patent Appeals in the *Hudson* case, *supra*, to the facts in the case at bar, I am constrained to come to the conclusion that it is evident the importer herein has utterly failed to establish his burden of proof as to the "ordinary course of trade" in England in reference to the exportation to the United States of men's wool sweaters at the time of exportation. Showing a variation in the course of trade of four English exporters out of a total of 10 or more is insufficient to establish the "ordinary course of trade" in the instant case, nor is the proof adequate as to what is normal in the trade generally under the statute.

A further question raised by plaintiff is the applicability of section 402(f)(3) of the above act, which reads as follows:

(f) DEFINITIONS.—For the purposes of this section—

\*  \*  \*  \*  \*  \*  \*

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

Counsel for plaintiff in his brief contends that Congress has made three alternate classes of "purchasers at wholesale," which are segregated or divided by the word "or"; that Savage is in the first category; that the second class should not be considered until the first is found to be inapplicable; and that the third class should not be considered until the first two classes are found not to be applicable. Unless sales are "freely" made to "purchasers at wholesale" in the "ordinary course of trade," it is without legal purpose to first ascertain into which one of the three classes the purchaser belongs. The appellate term in A.R.D. 162 made an effective reply to plaintiff's contentions, as follows:

Accordingly, whether or not a selected purchaser at wholesale, that is, one who buys for resale otherwise than at retail, takes precedence over all other purchasers for resale who buy in the usual wholesale

quantities, in view of the text of section 402(f)(3), *supra*, is beyond the scope of this inquiry, if sales to the selected purchaser are not in the ordinary course of trade, or were made at prices which do not fairly reflect the market value of the merchandise.

Plaintiff has failed to make out a *prima facie* case. The record does not contain evidence sufficient to overcome the presumptively correct value found by the appraiser on the basis of export value.

I find as facts upon the record presented:

1. That the merchandise consists of men's wool sweaters, cardigans, and pullovers exported from England on or about January 10, 1959, by W. F. Paine, Ltd., Alan Paine of Godalming, the manufacturer of said merchandise.

2. That said merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

3. That on or about the date of exportation, the importer Frank L. Savage, Inc., was the exclusive agent of the manufacturer for the distribution of the manufacturer's merchandise in the United States.

4. That the prices paid by the importer herein, as invoiced and entered for the involved merchandise, were not the prices at which such or similar merchandise was freely offered or sold to all purchasers at wholesale in the ordinary course of trade.

I find as conclusions of law:

1. That export value, as defined in section 402(b) and section 402(f)(1)(A), (B), and (2) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, is the proper basis for the determination of the value of the merchandise here involved.

2. That the importer has failed to make out a *prima facie* case.

3. That the proper export value for each of the several wool articles under consideration is represented by the presumptively correct appraised value for each wool article.

Judgment will be entered accordingly.