(A.R.D. 232)

INTER-MARITIME FORWARDING CO., INC. *v.* UNITED STATES

Entry No. 878535.

## Second Division, Appellate Term

(Decided January 24, 1968)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the appellant.
*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Steven R. Sosnov*, trial attorney), for the appellee.

Before FORD, RICHARDSON, and LANDIS, Judges

RICHARDSON, Judge: This application for review was filed by the importer against the decision and judgment of a trial judge sitting in reappraisement in *Inter-Maritime Forwarding Co., Inc.* v *United States*, 56 Cust. Ct. 670, R.D. 11157, and holding that export value as represented herein by the appraised values is the proper dutiable value of men's woolen sweaters exported from England. The involved sweaters were invoiced, entered, and appraised at the following per piece prices in shillings, British currency, less 3 percent cash discount:

| Quantity | Number and Item | Invoiced and Entered | Appraised |
|---|---|---|---|
| 74 | 4525 White Cable Sweaters | 39/0 | 46/0 |
| 64 | 31/6 White Cable Cardigans | 45/0 | 53/0 |
| 25 | —Richard Shetland Crew Neck Pullovers | 31/6 | 37/0 |
| 2 | —Carlton Lambswool Cardigans | 40/0 | 48/0 |
| 11 | —Chester Lambswool V-Neck Pullovers | 31/6 | 37/0 |

It was appellant-importer's contention below as it is here that the invoiced and entered values are the correct values for the sweaters at bar. No question is raised as to the basis of value adopted in the appraisement herein, which is export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956). And the difference between the entered and appraised values are items which are said by appellant to be a wholesale distributor's discount of 10 percent off the manufacturer's selling prices, and a wholesale quantity discount of 5 percent off such prices. These discounts, aggregating 15 percent, are not re-

flected in the appraised values. The issue before this court is whether the decision and/or judgment of the court below upholding the appraised values is supported by substantial evidence.

Section 1401a(b) reads as follows:

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

And 19 U.S.C.A., section 1401a(f) (section 402(f), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) reads in material part:

(f)  DEFINITIONS.—For the purposes of this section—

(1)  The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A)  to all purchasers at wholesale, or

(B)  in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2)  The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3)  The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

\*     \*     \*     \*     \*     \*     \*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices

for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

In *Inter-Maritime Forwarding Co., Inc.* v. *United States*, 48 Cust. Ct. 670, Reap. Dec. 10265, affirmed, *Id.* v. *Id.*, 51 Cust. Ct. 529, A.R.D. 162, the record in which case has been incorporated in the instant record, merchandise such as that at bar other than the Carlton Lambswool Cardigan and Chester Lambswool V-Neck Pullover sweaters was the subject of importation at the instance of the appellant-importer here. The record in the incorporated case consisted, among other things, of an affidavit of one F. Alan Paine (exhibit 1), the managing director of W. F. Paine, Ltd., the manufacturer and exporter herein, a report dated November 30, 1960 (exhibit A) of Senior Customs Representative James D. Carroll concerning an interview with F. Alan Paine, the affiant in exhibit 1, and the testimony of Frank L. Savage, president of Frank L. Savage, Inc., the ultimate consignee of the imported sweaters.

It was established by the evidence adduced in the incorporated case that during the period 1958 and 1959 the ultimate consignee Savage was the exclusive wholesale distributor and selling agent in the United States for the products of the manufacturer-exporter Paine, getting discounts aggregating 15 percent of the manufacturer's selling prices in the case of men's woolen sweaters purchased for its own account in quantities of 500 garments or more per style (the usual wholesale quantity) and a 10 percent commission on sales of such sweaters by Paine to United States retail purchasers either directly or through Savage's agency in quantities of about 3 dozen garments per style (the usual wholesale quantity), and that during said period a greater quantity of men's woolen sweaters was sold by Paine to retail purchasers in the United States than to Savage.

The trial court and appellate division sustained the appraiser's return of export value predicated upon Paine's prices to the retail purchasers. The trial court held that sales by Paine to United States purchasers other than to Savage at the appraised values were sales made to "all purchasers at wholesale" within the meaning of section 1401a(f)(1)(A). The appellate division, in addressing itself to the importer-appellant's contention for a primary and controlling valuation under the language "selected purchasers at wholesale" of section 1401a(f)(1)(B), observed that the record was barren of evidence as to how other British shippers of men's woolen sweaters conducted their businesses with American purchasers, and accordingly held that the appellant had failed to prove the "ordinary course of trade" mandated by section 1401a(f)(1)(B).

In the instant case and apart from the incorporated case record, the record consists of the testimony of three witnesses who were called by the appellant-importer with a view toward establishing the "ordinary course of trade" with respect to the sale of men's woolen sweaters in England for exportation to the United States on or about January 10, 1959, the date of exportation of the subject merchandise. Gotthold Kuehnert, president of the firm of A. Kuehnert & Co., Inc., an importer and wholesaler of men's knitwear, testified that during the involved period his company was the exclusive American agent for six foreign maufacturers of men's knitwear, of whom it appears that only the firm of J. D. McGeorge of Scotland made men's woolen sweaters. The witness stated that his firm bought sweaters from McGeorge for its own account as "back-up stock" in quantities of at least 500 pieces (the usual wholesale quantity) and was selling agent on some of the sales transactions involving men's woolen sweaters which were consummated between McGeorge and United States retail purchasers, that on its own purchases Kuehnert received a "commission" of 10 percent and 3 or 4 shillings—up to 5 percent which were arrived at by "bargaining", and on sales consummated between McGeorge and retailers in the States with or without Kuehnert's intervention, Kuehnert received a 10 percent commission, and that sales of men's woolen sweaters by McGeorge to United States customers were made only upon Kuehnert's approval.

Robert McCall, a director of F. A. MacCluer, Inc., a wholesale importer of sweaters testified, among other things, that during 1959 his company was the sole American selling agent for the Jaeger Company, Ltd. of London, England, and received an 11 percent commission based on the manufacturer's prices on all Jaeger sweater orders booked by MacCluer or on orders taken from American customers in London by Jaeger.

And F. Lennard Appleby of Robert Appleby & Co., an importer and distributor of British knitwear, testified that his company engaged in the men's knitwear trade toward the end of 1961 on a basis essentially the same as the arrangements testified to by the previous witnesses, handling the Monroe Spun sweaters (Monroe Spun, Ltd., Edinburgh, Scotland) both as wholesaler and as selling agent and getting a 15 percent discount on wholesale purchases, but no commission on sales made from its stock, and that the minimum wholesale quantity was 12 dozen sweaters and the usual wholesale quantity was closer to 1,000 sweaters.

On the augmented record the trial court again rejected appellant-importer's claim for valuation of the subject merchandise on the basis of Paine's prices to Savage, this time on the ground of non-

compliance with and failure of proof of the requirements of section 1401a(f)(1)(B). The trial court stated:

The present record shows that Kuehnert was the exclusive agent for only one sweater manufacturer in England, namely, McGeorge. While Paine could sell directly to United States purchasers with whom Savage had no previous selling experience, McGeorge could not sell to United States buyers without obtaining Kuehnert's prior approval. Kuehnert's arrangements were arrived at through bargaining. MacCluer was an importer in 1958 and a selling agent in 1959, and in 1960 did not purchase sweaters from Jaeger as shipments were made by Jaeger to MacCluer on consignment. MacCluer did not own the consigned merchandise but paid for it only after it was sold in the United States. Savage and Kuehnert owned the merchandise they obtained from their respective English principals and took the risks of ownership. Appleby's business relationship with Monroe in respect to men's knitwear trade did not commence until 1961 or 1962, whereas this case is concerned with exportations on or about January 10, 1959. Appleby also "bartered" as to amounts. Mr. Appleby's experience since 1955 referred to the men's wear trade as distinguished from the men's knitwear trade during 1958 and 1959. His testimony relates to a point of time remote from the date of exportation, and his knowledge of the trade in 1958 and 1959 was obtained from others. Thus, the testimony in the case at bar does not aid in ascertaining what is normal and usual and in the "ordinary course of trade" relating to men's wool sweaters exported from England on or about January 10, 1959.

Aside from the variations in the methods of practices of conducting business by Savage, Kuehnert, MacCluer, and Appleby with their respective exporters, Paine, McGeorge, Jaeger, and Monroe, as disclosed by the record, it is noted that there are at least six *other* large manufacturers of woolen sweaters in England, to wit, Coxmore; Pringle Co.; Ballantine; Turner, Rutherford; J. A. Robinson; and Braemar, as well as "many, many more smaller mills." While witnesses for plaintiff knew these named firms, no evidence was offered to establish that their practices in the trade in disposing of their merchandise to United States purchasers were in line with the practices alleged by any one of plaintiff's witnesses.

The language above noted comprises the crux of the decision of the court below. With respect to that portion of the trial court's decision set forth in the second paragraph above noted, it appears that the trial court addressed itself to language employed by the Appellate Term in the incorporated case wherein that court stated that "the record is barren of affirmative proof of how other *British shippers* of men's woolen sweaters conducted their businesses with American purchasers." [Emphasis supplied.] (51 Cust. Ct. 529 at p. 536.) In our opinion, while the instant record clearly supports the trial court's finding that there were at least six other large sweater manufacturers plus many smaller mills in the country of exportation, there is no evidence as to how many, or if any of these additional named and unnamed mills actually exported

their sweaters to the United States during the period of the involved exportations. And in the absence of evidence that the other mills were exporting their products to the United States, appellant is not required to produce evidence in this regard. Particularly, since only the subject of the mere existence of these other mills was injected into the case by appellee's counsel on cross-examination of the witnesses McCall and Appleby.

As to the practices of the three mills which form the mainstay of appellant's case, namely, McGeorge, Jaeger, and Monroe Spun, we fully agree with the trial court's conclusion that the export practices of these mills were shown to be at variance with the practices of Paine in exporting the involved merchandise to the United States, with respect to methods employed and amounts and kinds of discounts allowed off the mill price. And bearing in mind that we are concerned here only with wholesale discounts and not with selling commissions, and with the period on or about January 10, 1959, the export practices of two of said mills are at once shown to be disqualified as possessing any probative value on the matter of normalcy in the men's woolen sweater trade—Jaeger, because its export practices only resulted in the creation of a selling agency during the relevant period, and Monroe Spun, because its so-called comparable export practices developed well after the period of exportation here involved.

This leaves only the McGeorge mill for consideration. And as to the McGeorge mill we think a material variance existed between that mill's export practices and Paine's export practices in the manner of determination of the amount of discounts allowed off the mill price. Paine set the amount of discount it allowed Savage, while the discount allowed to Kuehnert by McGeorge was the product of "bargaining" to some extent. And in the case of the McGeorge-Kuehnert relationship the basic discount was denominated a "commission", which inclines us to believe that Kuehnert's status as a selling agent overshadowed or influenced its status as a wholesale purchaser, and that, in reality as appellee argues, Kuehnert's purchases of "back-up stock" on which such "commission" was paid was a servicing feature of its selling agency.

Taking the record as a whole, we are of the opinion that the mill practices relied upon by appellant, if indicative of anything, are indicative that *variation* rather than *uniformity* was the normal course which business took during the period in question in the men's woolen sweater trade between Great Britain and the United States.

Another facet of the case which militates against appellant on the instant record is the matter of the "usual wholesale quantity", which is said to consist of 500 sweaters. In the incorporated case the importation consisted of only 41 sweaters which were exported on January 15,

1959. In the instant case the importation consisted of only 176 sweaters which were exported on January 10, 1959. There is nothing in the record before us which indicates that these shipments represent only part of an order or orders placed abroad by Savage for larger quantities of men's woolen sweaters of Paine manufacture. This lapse of evidence is significant in our view because of the statement made by Paine's managing director (exhibit 1–I.R.) that an order by Savage for less than 500 garments would be unique, unusual, and not in the normal course of trade. This statement, proffered by appellant and received in evidence, constitutes an admission against appellant's interest relative to the efficacy of the instant transactions as being in the normal course of trade. Hence, if any credence is to be given to the affidavit containing such statement, we would be obliged to consider the involved importations as not being in the ordinary course of trade in view of the relatively small quantities of sweaters covered thereby.

We have considered the other assignments of error and arguments of appellant as well as the contentions of appellee, and find nothing therein which would lead us to adopt a conclusion different from that reached by the court below. Of particular interest is the contention advanced by appellee that appellant is precluded from claiming a valuation basis under section 1401a(f)(1)(B) per force of appellant's failure to show that the market in question was restricted to one or more selected purchasers, and appellant's failure to deal with the adjudicated applicability of section 1401a(f)(1)(A), *vis a vis* the holding of our appeals court in *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846, among other cases. We note, however, that this contention was not advanced before the trial court, but was raised for the first time before us. The instant case was tried and briefed before the trial court on the theory that section 1401a(f)(1)(B) was applicable, and the case was disposed of by the court below on the theory of that section. And it seems evident from the opening colloquy between the court below and counsel as well as from language of the court's opinion that the disposition sought and made below under section 1401a(f)(1)(B) was in deference to the ruling made by the Appellate Term in the incorporated case. Consequently, it would seem somewhat circuitous and inappropriate for us at this stage of the case to entertain and rule upon appellee's argument or contention respecting the applicability of section 1401a(f)(1)(A). We do not, therefore, pass upon the contention raised herein by appellee on pages 22 through 25 of its main brief under subheading B.

For the reasons stated, and upon the record herein, we find as facts:

1. The merchandise involved herein consists of men's wool sweaters, exported from England on or about January 10, 1959.

2. Said merchandise was appraised on the basis of export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at the manufacturer's list prices, less 3 percent cash discount.

3. The appraised values are the prices at which such merchandise was freely sold or offered for sale to all purchasers at wholesale at or about the time of exportation of the involved merchandise.

4. The evidence adduced by the appellant-importer fails to establish that the prices paid for the involved merchandise as invoiced and entered herein were the prices at which such or similar merchandise was freely sold or offered for sale to one or more selected purchasers at wholesale in the ordinary course of trade.

We conclude as matters of law:

1. That the evidence fails to rebut the presumption of correctness attaching to the appraised values.

2. That export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of the involved merchandise.

3. That such export value is represented herein by the appraised values.

Judgment of the trial court is affirmed, and judgment will be entered herein accordingly.